UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORT IRON & METAL COMPANY,

                Plaintiff,                Case No. 21-cv-12886

v.                                 Paul D. Borman
                                 United States District Judge

CITY OF DETROIT, a municipal
corporation, and DAVID BELL, an
individual, in his official capacity,

                Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S EMERGENCY VERIFIED MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 8)

On September 11, 2021, a catastrophic event occurred at the intersection of Fort and Dearborn Streets in the City of Detroit, which included a water main break, gas main break, property damage, and a significant upheaval in the road on Dearborn Street. Plaintiff Fort Iron & Metal Company operates a scrap facility at that location, and its operations were temporarily shut down by Defendant City of Detroit for three days following the incident. On December 9, 2021, Fort Iron filed the instant lawsuit against Defendants City of Detroit and David Bell, Director of the City of Detroit Buildings, Safety Engineering, and Environmental Department (BSEED), seeking money damages and declaratory and injunctive relief, alleging that Defendant City of Detroit threatened to issue another shut down order. Defendants filed their

Answer to Plaintiff's Complaint, and the City of Detroit/Counter-Plaintiff filed a Counterclaim against Fort Iron/Counter-Defendant.

Now before the Court is Plaintiff's Emergency Verified Motion for Preliminary Injunction (ECF No. 8), asking the Court to enjoin a December 16, 2021 Emergency Correction Order (ECO) issued by the City to Fort Iron that requires Fort Iron to provide a verifiable geotechnical report showing that its operations will not cause another catastrophic event. Defendants have filed a response to Plaintiff's motion (ECF No. 10). The Court held a hearing on Plaintiff's motion on Thursday, January 13, 2022. For the reasons that follow, Plaintiff's Emergency Verified Motion for Preliminary Injunction is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Relevant Facts

On September 11, 2021, an event occurred at the intersection of Fort and Dearborn Streets in the City of Detroit (the Event) that included a water main break, a gas main break, the formation of an eight to ten foot high "bubbled mound" in the road on Dearborn Street, and significant public and private property damage, including severe damage (partial collapse) of two buildings. (ECF No. 1, Verified Complaint, ¶¶ 3, 23-24.)

Plaintiff Fort Iron & Metal Company operates a scrap metal products processing facility and sells material to steel mills who use the scrap metal as raw material in the steel manufacturing process. (*Id.* ¶¶ 2, 28.) Fort Iron is located at the corner of Fort and Dearborn Streets and it was impacted by the Event. (*Id.* ¶¶ 2-3.) On the day of the Event and the following day, officials from Defendant City of Detroit worked with Fort Iron to ensure that the City's repair and investigation efforts did not interfere with the continuation of Fort Iron's business operations. (*Id.* ¶¶ 34-36.) Fort Iron resumed operations on the morning of September 13, 2021. (*Id.* ¶ 37.)

However, at 1:38 p.m. on September 13, 2021, representatives of the City of Detroit's Buildings, Safety Engineering, and Environmental Department (BSEED), escorted by Detroit police officers, shut down all of Fort Iron's operations. (*Id.* ¶¶ 4, 39.) Fort Iron received an email from BSEED (the Shutdown Order), stating:

> EFFECTIVE IMMEDIATELY YOU ARE TO STOP ALL OPERATIONS UNTIL FURTHER NOTICE FOR THE SAFETY OF THE EMPLOYEES AND PEOPLE IN THE SURRO[U]NDING AREA AT 9925, 9927, 9929, 9937 DEARBORN.

(*Id.* ¶ 40, citing Ex. C, ECF No. 1-3, 9/13/2021 email, PageID.42-43.) Fort Iron thus was forced to cease operations at its Property. (Compl. ¶ 46.)

On September 14, 2021, the Mayor of the City of Detroit declared a local state of emergency under Detroit Code Section 14-1-6, and issued Executive Order 2021-

3

03 "to assist in determining the cause of the emergency; to mitigate the danger posed by the emergency, seeking to protect life and property; and to correct for conditions which pose any threat to the public arising out of the emergency." (Compl. ¶ 42, citing ECF No. 1-4, EO 2021-03, PageID.44.) The Executive Order authorized the City to restrict "entry to land" and "the use of heavy machinery" (*id.*), and Fort Iron agreed with City officials that no heavy machinery should be operated at Fort Iron's premises until further notice. (ECF No. 1-6, 9/14/21 email, PageID.54.)

After the shut-down, Fort Iron informed Defendant Bell that it had engaged the services of the engineering firm, Spalding DeDecker, immediately following the Event, and that Spalding DeDecker was working on a report with respect to the safety of Fort Iron's operations. (Comp. ¶ 45.) BSEED then informed Fort Iron that, while the investigation was being conducted and it was awaiting the report, Fort Iron had "approval to use the office space only for administrative purposes," but otherwise kept in place the Shutdown Order forbidding operations. (*Id.* ¶ 51, citing Ex. F, ECF No. 1-6, 9/14/2021 email, PageID.53.)

Later that day, Fort Iron's counsel delivered to Defendant Bell a copy of the September 13, 2021 Spalding DeDecker Report (SDA Report), in addition to the report of a qualified railway consultant, with a cover letter. (Ex. A to Pl.'s Motion, PageID.200-07.) The two-page SDA Report stated that "there is no visual indication

4

of continued movement onsite however ongoing monitoring of the situation is recommended and, as additional information is available, a response plan should be updated." (*Id.* PageID.204.) The Report then made the following "Recommendations":

- Follow all relevant Fort Iron SOP for operations.

- Suspend all operations and within the proximity of the area of impact with a buffer of 100 [feet].

- Retention of consultant for monitoring changes of site condition.

- The operation of the onsite railway is to be in compliance with a railway inspection, by a qualified railway consultant.

- Follow all federal, state, and local regulations.

(*Id.* PageID.205.)

Fort Iron states that it immediately implemented all of the conditions of the SDA Report, and that it continues to implement those conditions. (Compl. ¶ 49.)

On the evening of September 15, 2021, representatives from the City and the Great Lakes Water Authority (GLWA) appeared at Fort Iron's facility and urged Fort Iron to promptly remove materials from the area of its facility that had been impacted by the Event (Area 1) to other locations on the Property (Area 2), to protect the soil stability of the Intersection. (Compl. ¶¶ 54-55.) At that same time, based upon the delivery of the Spalding DeDecker Report, Defendant Bell, in an email,

5

vacated his September 13th shutdown order, writing: "This is the all clear to begin operations and remove the mill scale from the pile at the corner of Dearborn and Fort via the joint effort we discussed tonight." (Ex. B to Pl.'s Mot., PageID.209) (ECF No. 1-8, emails, PageID.56-61.) In addition, Abdul Abbas, a BSEED associate engineer, stated:

> [S]ince the site was inspected by Spalding ..., it is my opinion that Fort Iron can reasonably resume operations with strict adherence to [Spalding]'s recommendations and the Fort Iron's SOP operation guidelines including the way using [sic] of the facility as provided by the aerial photos.

(Ex. B to Pl.'s Mot., PageID.210-11.)

Fort Iron states that it then proceeded to work throughout the night of the 15th (with representatives of the City and GLWA present), to remove and relocate stockpiled materials from Area 1 to other locations throughout the facility unaffected by the Event (Area 2). (Compl. ¶¶ 58-59.) Fort Iron asserts that, since the Event, it has not engaged in any operations on the Property near the Intersection, it has reduced the height of its high-density stockpiled materials, and it has removed most of the mill scale off the Property. (*Id.* ¶¶ 62-63.)

Fort Iron also engaged TEC Engineering (TEC), and then G2 Consulting (G2), as its geotechnical experts, to confirm the safety of Fort Iron's continued operations and to investigate the cause of the Event. (Compl. ¶ 60.) Following the guidance of

its experts, Fort Iron installed numerous vertical and lateral ground stability monitors on the Property, at the Intersection, and in the surrounding neighborhood, and has conducted daily monitoring. (*Id.* ¶ 61.)

For the next month, Fort Iron engaged in its regular business operations with no interference from the City. (Compl. ¶ 68.) Fort Iron continued to remove materials from Area 1 to various locations in Area 2, and reduced the elevation of Area 1 to under the City's requested elevation of 591 feet. Fort Iron worked with representatives from the City's Department of Public Works, DTE Energy, Comcast, and other contractors as they engaged in repair and remediation efforts. (*Id.* ¶¶ 62-68.)

On October 13, 2021, representatives of Fort Iron and the City met to discuss the status of the City's efforts and the scope of its investigation into the Event. (Compl. ¶ 69.) According to Fort Iron, at that meeting, the City advised that its report would be issued "in a week," and Defendant Bell (appearing by telephone) requested another report from Fort Iron confirming the safety of Fort Iron's operations. (*Id.* ¶ 70.)

On October 21, 2021, the City issued a follow-up email correspondence to Fort Iron requesting a geotechnical evaluation report, which Fort Iron alleges was much broader in scope than that requested by Bell during the meeting the week

before. (Ex. C to Pl.'s Motion, PageID.216-18.) The email specifically included "a

general list of the anticipated report contents:"

- Property information/background

- Lateral & vertical soil stability plan

- Geologic hazards (erosion/ surface, runoff, site drainage, subsurface utilities, flooding, soil slope stability, ground-shaking, settlement, etc.)

- Description/ location of all existing infrastructures, such as buildings, internal access roads, utilities, surface pavement, property fencing, retaining walls, sheet piles, etc.

- Description/ location of bulk solids storage including type of materials stored/ managed, size/ height of bulk solid stockpiles, setbacks, etc.

- Supporting analysis/ geotechnical data including detailed geologic cross-sections & maps

- Known or verified environmental conditions

- Conclusions and recommendations for further investigative activities or corrective actions, if necessary

- Statements from the professional engineer as to the adequacy and stability of the property for the ongoing use(s) or intended use(s) and that any proposed or ongoing site operations will not adversely impact the property or adjoining properties including, but may not be limited to, rights-of-way, offsite utility assets, etc.

- Based on site conditions & ongoing property use(s) or intended property use(s), the report must also include a statement from the professional engineer on his/ her opinion on the lengthy [sic] of time

> the geotechnical report is considered valid (e.g. 2, 3 or 5 years) from
> the date the report prepared/ submitted to BSEED

(*Id.*)

After discussions with the City regarding the scope of the requested report, Fort Iron engaged G2 Consulting Group to prepare a report that addressed the safety of Fort Iron's current operations, and, on November 18, 2021, Fort Iron delivered G2's sealed Stockpiling Operations Evaluations Report to the City. (Ex. D to Pl.'s Motion, G2 Report, PageID.220-21.) In its one-page letter report,[1] G2 Consulting stated that it had completed its "preliminary evaluation of the current stockpiling operations at" Fort Iron, and opined that:

> We performed geotechnical investigations, reviewed instrumentation
> data, review[ed] geotechnical data performed by others, as well as other
> information provided by you. Finally, we performed calculations and
> analyses using the data mentioned. Based on our review and analyses,
> it is our opinion that the current operations have a stability factor of
> safety greater than 1.3. As such, it is our opinion that these operations
> are acceptable.

---

[1] The second page of the letter report contains only one summary paragraph, but no substantive analysis, stating:

> Sealing this letter indicates that the calculations were performed under
> the direction of the signatory. We appreciate the opportunity to be of
> service to you on this project and look forward to discussing the
> responses presented. If you have any questions regarding this letter or
> any other matter pertaining to the project, please call us.

(G2 Report, PageID.222.)

9

(*Id.*) The report further stated: "Based on our observation and analyses along with the continued ground movement monitoring, it is our opinion that the current operations in Area No. 2 are stable, and we do not recommend any changes from current operations in this Area No. 2." (*Id.*) The report concluded that G2 "will continue to monitor the site, evaluate instrumentation data, and perform analyses for the indefinite future to confirm its ongoing stability." (*Id.*) In the cover letter attaching the G2 Report, Fort Iron's counsel stated that "[w]e trust that the G2 Report will satisfy the City's request for information regarding the safety of Fort Iron's operations at the Property." (Ex E to Pl.'s Mot., 11/18/2021 Letter, PageID.223-24.)

The following day, November 19th, Lawrence Garcia, then-Corporation Counsel for the City of Detroit, responded to Fort Iron's counsel, thanking him for the report, but requesting a "more detailed report that addresses more of the bullet-point items listed in" the City's October 21, 2021 email. (ECF No. 1-12, 11/19/2021 email, PageID.71-72.) The City Defendants note in their Response brief that G2's Report "did not identify the scope of 'current operations' or the amount of mill scale that could safely be piled or where; [and] G2 did not provide the results of any geotechnical investigations it claimed to have conducted nor the calculations or analyses that it claimed supported its conclusion." (ECF No. 10, Defs.' Resp. at p. 4, PageID.394.)

Jonathan Zaremski, P.E., Geotechnical Services Manager for Somat Engineering, Inc., hired by the City Defendants, has provided a declaration in which he opines that the November 17, 2021, G2 letter report does not provide sufficient information to determine or establish: (i) what are the safe operational parameters of mill scale storage at the Fort Iron site, and (ii) whether Fort Iron is operating safely such that another catastrophic ground failure will not occur. Mr. Zaremski concludes that the G2 letter is deficient in that it is labelled "preliminary," and that it does not append and incorporate into the report the underlying data and analyses upon which the conclusion is based. Mr. Zaremski opines that the conclusion of a global stability factor of safety of 1.3 at the site with the on-going stockpiling of mill scale is less than the minimum value of 1.5, generally accepted in the industry for similar applications, and that a summary conclusion of a stability factor of 1.3 (or higher), and that operations at Fort Iron are otherwise safe, without attachment, incorporation, and analysis of all supporting materials, does not permit meaningful expert review and is therefore unreliable. (ECF No. 10-5, Declaration of Jonathan D. Zaremski, P.E., January 6, 2022 (Zaremski Decl.), ¶ 5, PageID.434-35.)

According to Fort Iron, its counsel engaged in additional phone calls and emails with counsel for the City, up until December 1st, to try to schedule a meeting

with appropriate representatives and their engineers to discuss the additional data requested. (Compl. ¶¶ 79-80) (Ex. G to Pl.'s Motion, Emails, PageID.238-41.)

Plaintiff alleges, however, that on the evening of Friday, December 3, 2021, the City threatened to shut down all of Fort Iron's storage operations, including Area 2, unless Fort Iron would agree to an "immediate" meeting on Saturday, December 4th. (Compl. ¶ 82.) Counsel for Fort Iron advised that he was out of town for the weekend and thus a Saturday meeting was impossible. (*Id.*) Counsel for Fort Iron sent a lengthy letter to Defendant Bell the morning of December 4th, outlining the parties' interactions since the Event, suggesting a meeting between the parties' engineers as "the best way for the parties to efficiently determine what, exactly, is needed," and proposing a meeting on Wednesday, December 8th. (Ex. F to Pl.'s Motion, 12/4/2021 Letter, PageID.231-35.)

Fort Iron asserts that it made repeated efforts to confirm a meeting with representatives of the City and to ensure that Fort Iron would not be shut down, but it received no response until the evening of December 5th, at which time Fort Iron's counsel verbally agreed to a Monday, December 6, meeting. (Compl. ¶ 88.) After receiving no confirmation of the time of the meeting from the City's Corporation Counsel, counsel for Fort Iron sent an email early on December 6th to confirm the

meeting, but received no response. (Ex. G to Pl.'s Motion, 12/6/2021 email, PageID.237.)

Fort Iron then commenced this lawsuit on December 9, 2021, asserting that it was facing the threat of a shutdown of its operations. (ECF No. 1, Verified Complaint.)

On December 13, 2021, Somat Engineering, Inc. provided its 43 page geotechnical report to the City, signed by Jonathan Zaremski, P.E., Geotechnical Services manager for Somat Engineering, and addressing the "Ground Upheaval Incident" at the intersection of Fort and Dearborn Streets in Detroit. (Ex. I to Pl.'s Mot., Somat Report, PageID.246-294.) The Somat Report "primarily addresses the geotechnical aspects of the site investigation that were performed post-incident to determine the most likely cause of the ground upheaval." (*Id.* PageID.248.) The Report states, in part:

> Ultimately, it is our professional engineering opinion that the weight of the stockpiled mill scale material exceeded the shear strength capacity of the underlying clay soils to cause the heaved areas and disruption to the existing structures adjacent to the Fort Iron site. Other factors such as consolidation settlement may have contributed to the incident and/or the timing of the incident, but the primary cause of the soil failure was the load imposed by the mill scale stockpile.

(*Id.* PageID.249.)

13

Defendants argue in their Response brief that any doubt that Fort Iron's storage of mill scale caused the September 11, 2021, upheaval was eliminated by a second upheaval caused by Fort Iron on or about November 18, 2021, at 1715 W. Pleasant Street in River Rouge, Michigan. (Defs.' Resp. at pp. 10-11, PageID.400-01, citing Ex. B, ECF No. 10-3, Photos, PageID.423.) Defendants noted that, after the September incident in Detroit, Fort Iron rented the River Rouge site to stockpile its mill scale. That stockpile of mill scale collapsed and caused approximately 40 feet of adjacent sidewalk to heave many feet in the air. (*Id.*) Defendants point out that Fort Iron attached a news article to its motion for preliminary injunction which reports that Fort Iron had paid to store the mill scale at the site of the River Rouge ground failure. (See Pl.'s Mot., PageID.371.) [2]

Defendant City of Detroit has filed a counter-complaint against Fort Iron in this case to recover costs it has incurred to date in excess of $500,000 to respond to

---

[2] Defendants state that, based upon the two ground failures to date caused by Fort Iron, on or about December 21, 2021, DTE Energy sued Fort Iron in Wayne County Circuit Court to recover costs it incurred from the damages caused by Fort Iron to DTE's utility installations in Detroit and River Rouge. (Defs.' Resp. at p. 11, PageID.401, citing Ex. D, ECF No. 10-4, DTE lawsuit, PageID.424-32.) In that lawsuit, DTE also seeks to enjoin Fort Iron from causing yet another mill scale ground failure. (*Id.*)

and remedy the nuisance caused by ground movement and upheaval on September 11, 2021 in Detroit. (ECF No. 5.)

Following the City's receipt of the Somat Report, on December 16, 2021, BSEED Inspector Carl Craik arrived, unannounced, at Fort Iron's Detroit facility for an inspection. (Pl.'s Mot. at p. 7, PageID.184.) Fort Iron's counsel advised Mr. Craik that he would not be allowed to inspect the facility, but that his office could contact Fort Iron's counsel, advise as to the proposed purpose of the inspection, and that a mutually agreeable date could be selected for a planned inspection. (*Id.*)

Mr. Craik left, and then returned from his vehicle with an Emergency Correction Order (ECO) issued to Fort Iron. (Ex. H to Pl.'s Motion, 12/16/21 ECO, PageID.243-44.) The ECO indicates that Fort Iron "[f]ailed" an "Emergency Inspection," stating that "[t]he Property Maintenance inspected the above premises on 12/16/2021. Violations of the Detroit Property Maintenance Code and/or Official Zoning Ordinances were found to exist and corrections shall be made on or before the compliance date. 12/21/2021." (*Id.*) Fort Iron questions the basis for this ECO because an inspection had not been conducted that day.

The ECO states that "the City's engineering report" "determined that the weight of the mill scale pile at the premises was the primary cause of significant ground movement" that resulted in the September 11, 2021 Event. (*Id.*) The ECO

15

continued that "[d]ue to the soil bearing capacity failure at the premises, there shall be no additional storage of mill scale or similar weighted materials until a current geotechnical report signed and sealed by a licensed engineer is submitted to this Department for review and approval." (*Id.*) The ECO then listed the information required to be included in the geotechnical report, which mirrors the information the City first requested in its October 21st email to Fort Iron. (*Id.*)

The ECO was accompanied by an explanatory letter to Fort Iron from BSEED Director Bell, explaining why it was necessary to issue the ECO to Fort Iron. (ECF No. 5-3, 12/16/2021 Letter, PageID.165-67.) The letter stated that, despite repeated requests, Fort Iron has not produced the technical data upon which the G2 Report relies to make the "summary conclusion … that the area where the ground failed on September 11, 2021 has a safety factor of 1.3," and that "[n]othing has been provided to the City to show whether it is safe to resume the storage of mill scale or other materials, and what limitations on storage are necessary to ensure there will not be another soil capacity failure event such as that which occurred on September 11, 2021." (*Id.*) The letter explains that the City's "concerns about the danger of resuming mill scale storage at Fort Iron without geotechnical data to support such use has been amplified by the event which happened in mid-November in the City of River Rouge." (*Id.*) The letter continues that "the accompanying Corrective Order

requires production of the report by G2 Consulting, or such other report that satisfies the requirements of State law and City Code, or the facility necessarily will be closed until the requisite geotechnical information is supplied showing the safe operational parameters for the site." (*Id.*)

The City agreed to extend the ECO's original December 21, 2021 compliance deadline to January 7, 2022, and thereafter to January 20, 2022, upon request from the Court, to provide the Court time to address the instant Plaintiff's Emergency Verified Motion for Preliminary Injunction.

The "City's engineering report" referred to in the ECO is the December 13, 2021 Somat Report, received just three days prior to the ECO. According to Fort Iron, the Somat Report does not address Fort Iron's current operations, but instead exclusively relates to the September 11, 2021 Event. Fort Iron contends that, at best, the Somat Report relates to Area 1 on Fort Iron's property – the area that Fort Iron no longer uses for its operations. (Pl.'s Mot. at p. 8, PageID.185.)

After issuance of the ECO, Fort Iron sent several detailed correspondence to the City, dated December 16, 17, 20, and 22, 2021, outlining Fort Iron's attempts to comply with the City's requests in the past, its attempts to comply with the demands of the ECO, including supplying additional data, and offering to meet and confer further regarding to the City's demands. (Ex. J to Pl.'s Motion, PageID.296-358.)

17

Fort Iron states that it has complied with the ECO's demand that Fort Iron not add any additional materials to its facility, and that it has, in fact, since November, steadily reduced its quantity of high-density materials by approximately 50%, and it denies that it has violated any City ordinances or the Michigan Building Code. (*Id.* PageID.351-52.) Fort Iron states that, since the Event, it has engaged in daily ground monitoring (twice daily for months), which has demonstrated no relevant ground movement, it has reduced the heights of its high-density materials as well as reduced its overall quantities of those materials beyond what has been recommended, and, since the issuance of the ECO, has provided the City all of its soil borings and lab testing data, a vibration monitoring report, photographs of the high density materials, and a written confirmation that it will continue to reduce the quantities of high-density materials from its facility. (*Id.* PageID.301-58.)

Significantly, Fort Iron did not comply with the City's October 21, 2021 and December 16, 2021 requests for a geotechnical evaluation report.

Defendants acknowledge that Fort Iron has provided some data since the ECO was issued, "all of which was marked draft, preliminary and subject to revision," and "which does not show how G2 reached the conclusion that Fort Iron could safely operate as stated in its 'preliminary' one-page letter." (Defs.' Resp. at p. 13, PageID.403.) Defendants contend that Fort Iron instead filed the instant motion and

18

asks the Court to decide that mill scale can safely be piled at Fort Iron, and that Fort Iron can continue to operate without complying with the City's request for geotechnical proof that Fort Iron's activities will not cause another catastrophic upheaval of the ground. (*Id.* at pp. 13-14, PageID.403-04.)

### B. Procedural History

On December 9, 2021, Plaintiff Fort Iron filed its Verified Complaint for Declaratory and Injunctive Relief, Damages, Just Compensation and Other Relief. (ECF No. 1.) Plaintiff asserts five claims against Defendants City of Detroit and David Bell: (1) Count I – Declaratory Relief; (2) Count II – Violation of Substantive Due Process; (3) Count III – Violation of Procedural Due Process; (4) Count IV – De Facto or Temporary Taking/Inverse Condemnation Under the U.S. Constitution and the 1963 Michigan Constitution; and (5) Count V - 42 U.S.C. § 1983 Violation of Due Process.

On December 21, 2021, Defendants City of Detroit and David Bell filed their Answer to Plaintiff's Complaint, with Affirmative Defenses, and the City of Detroit filed a Counterclaim against Fort Iron, seeking to enjoin and recover damages for Fort Iron's creation of an alleged public and private nuisance. (ECF No. 5.)

On December 23, 2021, Plaintiff filed the instant Emergency Verified Motion for Preliminary Injunction. (ECF No. 8, Pl.'s Mot.) Fort Iron petitions for an

immediate preliminary injunction enjoining the City from: (1) enforcing the December 16, 2021 ECO; and (2) issuing another such order pending the final disposition of this case or further order of the Court.

On January 10, 2022, Defendants filed their Response in opposition to Plaintiff's motion. (ECF No. 10, Defs.' Resp.) Defendants argue that Fort Iron has failed to meet the standard required for preliminary injunctive relief, and that Plaintiff's motion therefore must be denied.

## II.  LEGAL STANDARD

Preliminary injunctions are extraordinary remedies designed to protect the status quo pending final resolution of a lawsuit. *See University of Texas v. Camenisch*, 451 U.S. 390 (1981). A plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief, *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000), and such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Whether to grant such relief is a matter within the discretion of the district court. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).

When considering a motion for injunctive relief, the Court must balance the following four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief; (3) whether granting the preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by granting the preliminary injunctive relief. *Certified Restoration Dry Cleaning Network*, 511 F.3d at 542. "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

"[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary*, 228 F.3d at 739. A plaintiff must do more than just "create a jury issue," and must persuade the court that it has a likelihood of succeeding on the merits of its claims. *Id*. A plaintiff must demonstrate that it is *likely* to suffer irreparable harm in the absence of an injunction. *See Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in

the absence of an injunction.") (emphasis in original) (internal citations omitted). "The 'key word' in determining the extent of an injury sufficient to support the award of injunctive relief is 'irreparable.' Mere injuries, however substantial, are not enough. Rather, 'the harm alleged must be both certain and immediate, rather than speculative or theoretical.'" *Hudson v. Caruso*, 748 F. Supp. 2d 721, 730 (W.D. Mich. 2010) (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). "This is because the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Leary*, 228 F.3d at 739 (internal quotation marks and citation omitted, alteration in original).

## III. ANALYSIS

### A.     Strong Likelihood of Succeeding on the Merits?

Plaintiff Fort Iron seeks a declaration that its current operations do not pose an "imminent danger" or "emergency" as defined by §§ 8-15-5 and 8-15-6 of the City's Property Maintenance Code. (Pl.'s Mot. at p. 13, PageID.190.)[3] An

---

[3] Count I of Plaintiff's Complaint asks this Court to declare, in part, that "Plaintiff's operations do not pose any threat to the public health, safety, or welfare," and that "[n]o emergency, imminent danger, or exigent circumstances exist to warrant any shutdown order." (Compl. ¶ 111.)

22

"emergency" under the City Property Maintenance Code is defined as "any condition in a building, premises, or structure that reasonably constitutes a threat to the public interest, safety, or welfare," and an "imminent danger" "means a condition which could cause serious or life-threatening injury, or death, to persons at any time due to the maintenance, or lack of maintenance, of a building, premises, or structure." Detroit City Ordinance §§ 8-15-5 and 8-15-6.

Fort Iron contends that the December 16, 2021 ECO does not identify any condition in Fort Iron's premises that constitutes a "threat to the public interest, safety, or welfare." (Pl.'s Mot. at p. 14, PageID.191.) Fort Iron states that, since the Event, it has: (1) delivered the G2 Report and supporting data, (2) delivered the vibration study by TEC, (3) reduced the stockpiled materials in Area 1, (4) engaged in daily ground movement monitoring and shared that information with the City, and (5) not only committed to not bringing additional high density materials to its facility, but significantly reduced its quantities of onsite high density materials. (*Id.* at pp. 14-15, PageID.191-92.) Fort Iron argues that Defendants' December 13, 2021 Somat Report has nothing to do with Fort Iron's current operations.

Defendants argue in response that Fort Iron has failed to show that it has a strong likelihood of success on its request for a declaratory judgment, which essentially asks this Court to decide that Fort Iron's stockpiling of mill scale did not,

23

and does not, pose an imminent threat of another ground upheaval. (Defs.' Resp. at pp. 16-17, PageID.406-07.) Defendants rely on the December 13, 2021 Somat Report's findings, and state that the Michigan Building Code expressly authorizes the City's Building Official to demand a geotechnical report, citing Michigan Building Code §§ 1803.2, 1803.3–1803.5, and the Detroit City Ordinance, § 8-15-16, which provides that:

> Requirements necessary for the strength, stability or proper operation of an existing building, premises, structure, fixture, or equipment, or for the public safety, health, and welfare, not specifically covered by this article, or any other applicable state law or provision of the 2019 Detroit City Code, shall be determined by the Building Official.

(*Id.*)

Defendants assert that they should not be forced to rely on Fort Iron's one-page letter report from G2 labeled "preliminary." (Defs.' Resp. at pp. 17-19, PageID.407-09.) Defendants explain that G2's Report "did not identify the scope of 'current operations' or the amount of mill scale that could safely be piled or where; [and] G2 did not provide the results of any geotechnical investigations it claimed to have conducted nor the calculations or analyses that it claimed supported its conclusion." (*Id.* at p. 4, PageID.394.) Defendants present the unrebutted declaration from Jonathan Zaremski, P.E., Geotechnical Services Manager for Somat Engineering, Inc., opining that the November 17, 2021 G2 letter report does not

24

provide sufficient information to determine or establish: (i) what are the safe operational parameters of mill scale storage at the Fort Iron site, and (ii) whether Fort Iron is operating safely such that another catastrophic ground failure will not occur. Mr. Zaremski concludes that the G2 letter is deficient in that it is labelled preliminary and that it does not append and incorporate into the report the underlying data and analyses upon which the conclusion is based. Mr. Zaremski states that the conclusion of a global stability factor of safety of 1.3 at the site with the ongoing stockpiling of mill scale is less than the minimum value of 1.5, which is generally accepted in the industry for similar applications, and that a summary conclusion of a stability factor of 1.3 (or higher), and that operations at Fort Iron are otherwise safe, without attachment, incorporation, and analysis of all supporting materials, does not permit meaningful expert review and is therefore unreliable. (Zaremski Decl., ¶ 5, PageID.434-35.)

Fort Iron has failed, for three months, to provide the geotechnical report requested by the City.

The Court finds that Fort Iron has failed to demonstrate a strong likelihood of success on the merits of its claim for declaratory relief. Contrary to Fort Iron's assertion in its motion that "[t]he City has furnished nothing to show that Fort Iron's current and legal operations pose any imminent danger or emergency, violates any

ordinance, or violate[s] its operating license," (Pl.'s Mot. at p. 14, PageID.191), the City has provided Fort Iron with a copy of the Somat Report it received three days prior to issuance of the ECO, which determined that the weight of the mill scale pile on Fort Iron's premises was the primary cause of the Event, because the weight of the stockpiled mill scale exceeded the sheer strength capacity of the underlying clay soils, resulting in the heaved areas and property damage.

Contrary to Plaintiff's counsel's arguments at the hearing, the December 16, 2021 ECO did not "come out of the blue." The ECO cannot be considered in a vacuum. The catastrophic Event occurred on September 11, 2021. The City's investigation of the Event was ongoing, and in October 2021, the City requested a more fulsome geotechnical report from Fort Iron, that has never been provided by Fort Iron.

The City had received the Somat Report on December 13, 2021, identifying Fort Iron's facility as the cause of the Event, and the City reasonably requested a geotechnical report from Fort Iron addressing the safety of its ongoing operations. As Defendant Bell explained in his letter accompanying the ECO, the City's concerns about the safety of Fort Iron's continued operations "has been amplified by the [Fort Iron] event which happened in mid-November in the City of River Rouge." (Bell 12/16/21 Letter, PageID.166.) The ECO stated that "there shall be no

additional storage of the mill scale of similar weighted material until a current

geotechnical report signed and sealed by a licensed engineer is submitted to the

BSEED for review and approval." (ECO, PageID.243.) The ECO cited the State and

City building code provisions on which it is based, and listed the items to be included

in the geotechnical report, which were the same as those listed in the October 2021

email from the City to Fort Iron. (*Id.*) As Defendants explain, the Michigan Building

Code expressly authorizes the City's Building Official to demand a geotechnical

report, (Defs.' Resp. at pp. 17-18, PageID.407-08), and the City has been requesting

such a report since October. It is not the role of this Court to overrule or second-

guess the determination of the City's Building Official, or a geotechnical expert, that

there is a continuing risk to public safety, based on the Somat Report, which requires

a proper geotechnical report. While Fort Iron would like to ignore the Somat Report,

or discount or second-guess the City's reliance on that report, the Court will not.

Fort Iron's failure to provide a geotechnical report with regard to the September 11,

2021 catastrophic event on its property, the adjacent public streets and the buildings,

supports this Court's decision to deny Plaintiff's request for a preliminary injunction.

Instead, Fort Iron relies on the September 13, 2021 two-page report from

Spalding DeDecker, and the preliminary, one-page letter report from G2 dated

November 18, 2021, to argue that it has complied with the ECO, but neither of these

27

reports satisfies the City's requirement of a current geotechnical report, as requested in the October 21, 2021 email, and as required by the December 16, 2021 ECO.

The Spalding DeDecker Report, dated September 13, 2021, states that it is a "post-incident civil site assessment," and recommends "ongoing monitoring of the situation" and an updated response plan as additional information is available. (SDA Report, PageID.204.) And as Defendants correctly point out, the cursory one-page G2 Report is labeled "preliminary" and contains no underlying data or basis for its conclusory statement that "the current operations have a stability factor of safety greater than 1.3," which it deemed "acceptable." (G2 Report, PageID.220.) While Fort Iron contends that it has since provided other data and a vibration study to Defendants, it is undisputed that Fort Iron has not provided the City with a current geotechnical evaluation report, as requested in the October 21, 2021 email to Fort Iron, and as required by the December 16, 2021 ECO.

Fort Iron asserts that, in issuing the ECO, the City violated Fort Iron's due process "inspection" rights as provided under § 8-15-34 of the City's Code of Ordinances, which provides for notice of pre-inspection rights. (Pl.'s Mot. at p. 15, PageID.192.) As Defendants correctly state in their Response brief, the only case that Fort Iron cites to support its argument, *MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404 (E.D. Mich. 2019), is inapplicable here; that case addresses the

28

process required before the City conducts an annual rental property inspection as provided by the City's Property Maintenance Code. *See MS Rentals*, 362 F. Supp. 3d at 407-08 (addressing the involuntary inspection provisions regulating landlords and the rentals of residential housing units).

Here, Defendants requested the geotechnical report from Fort Iron three months ago, and issued the ECO to Fort Iron a month ago, providing a reasonable period for Fort Iron to comply. To reiterate: Defendants have been requesting the same geotechnical report from Fort Iron for three months, since October, 2021. Fort Iron has not credibly argued in its motion that it is impossible to comply with the order, or that the ECO is otherwise impermissibly burdensome. In fact, Plaintiff's counsel contends that he has already provided the requested information in a December 4, 2021 letter to the City, and that if Defendants wanted the same responses from "an expert," Plaintiff could "very easily" provide that. Still, no report has been provided.

Defendants have asserted that if Fort Iron fails to comply with the ECO, and given the Building Official's determination that there is an imminent danger, the Detroit City Code § 8-15-42 provides that the City can order the premises closed until Fort Iron brings the premises into compliance, and Fort Iron can seek a hearing before an administrative hearing officer upon the issuance of a closure order. (Defs.'

Resp. at p. 19, PageID.409, citing Detroit City Code §§ 3-1-4, *et seq.*, 8-15-36 and 8-15-44.)

The Court finds that Fort Iron has failed to satisfy its heavy burden of showing a strong likelihood of success on the merits of its declaratory judgment claim, and thus it has failed to meet its burden to show that it is entitled to the extraordinary remedy of a preliminary injunction here. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales*, 225 F.3d at 625.

## B.     Irreparable Harm?

"Although the four factors must be balanced, the demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002). The irreparable injury alleged must be "both certain and immediate, rather than speculative or theoretical." *Griepentrog*, 945 F.2d at 154. An injury is irreparable if it is not "fully compensable by monetary damages." *Certified Restoration*, 511 F.3d at 550. Further, a plaintiff's mere assertion that it will be injured, however seriously, is insufficient. *See Griepentrog*, 945 F.2d at 154. Rather, "to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.*

Fort Iron alleges that a shutdown of its operations and use of its property would cause it irreparable injury. (Pl.'s Mot. at pp. 17-18, PageID.194-95.) Fort Iron alleges multiple injuries: loss of business to competitors, contractual obligations, forced storage of rail cars, loss of materials, interrupted shipping, and "revenue losses," as well as effects on other upstream and downstream entities. (*Id.*)

However, as stated above, "to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *See Griepentrog*, 945 F.2d at 154. Fort Iron's assertion that it will be injured, even seriously, is insufficient where, in this case, it has refused, time and again, to respond to the City's reasonable request to Fort Iron for a geotechnical report. *See id.* Further, Fort Iron has not offered any admissible evidence, such as an affidavit, a declaration, or other admissible evidence, showing that it is in imminent danger of irreparable harm. And, as Defendants argue, these alleged harms appear in general to be compensable in money damages. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (citation omitted).

31

Accordingly, the Court finds that Plaintiff Fort Iron has failed to show that it is in imminent danger of irreparable harm in the absence of an injunction prohibiting the City from enforcing the ECO, and thus this factor weighs against granting Fort Iron's motion for preliminary injunctive relief.

## C.   Harm to Others and Public Interest?

In the third and fourth factors of the preliminary injunction analysis, the Court must consider whether issuing the injunction would result in substantial harm to others, and "whether the public interest would be served by the issuance of the injunction." *Certified Restoration*, 511 F.3d at 550-51.

### 1.   Harm to others

Fort Iron does not address the "harm to others" factor in its motion requesting a preliminary injunction. Defendants argue that any injunction against public officials, charged with the enforcement of public safety regulations, would cause harm to others. Defendants point out that the ECO was issued because Fort Iron has already caused substantial harm to others from two separate ground upheavals, and the correction order seeks to protect others by ensuring that Fort Iron's operations do not cause another ground upheaval or similar damage. This argument, with respect to Fort Iron's facility in Detroit, is supported by the findings of the Somat

Report. Defendants' argument is persuasive and the Court finds that the third factor does not weigh in favor of issuing the injunction Fort Iron seeks.

### 2.   The public interest

Finally, Fort Iron summarily contends that the public interest favors entry of a preliminary injunction because the ECO violates Fort Iron's constitutionally protected interest to due process. (Pl.'s Mot. at p. 19, PageID.196.) However, as Defendants state in their Response, Fort Iron does not explain how the ECO violates its due process rights. (Defs.' Mot. at p. 22, PageID.412.) The December 16, 2021 ECO provides the basis for the correction order and initially gave Fort Iron until December 21st to comply with the requirement for a current geotechnical report, as outlined in the ECO. That December 21st date has since been extended twice. Yet, Fort Iron has not provided a geotechnical report. An injunction allowing Fort Iron to defy this Emergency Correction Order is not in the public interest.

Accordingly, this final factor weighs against Fort Iron's request for a preliminary injunction order.

## IV.  CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff Fort Iron's Emergency Verified Motion for Preliminary Injunction Against Defendants the City of Detroit and David Bell, in his official capacity (ECF No. 8).

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: January 18, 2022